# EXHIBIT A

NOTICE OF REMOVAL

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT

PEAR THERAPEUTICS, INC.,

       Plaintiff,

    v.

DROR BEN-ZEEV,

       Defendant.

CIVIL ACTION No. _____

RECEIVED
AUG 15 2018
SUPERIOR
MICHAEL
CLERK
JOSEPH

## COMPLAINT

### Parties

1.    Plaintiff Pear Therapeutics, Inc. ("Pear") is a corporation organized under the laws of the state of Delaware with its primary place of business in Boston, Massachusetts. Pear develops clinically-validated, FDA-cleared prescription digital therapeutics to provide better outcomes for patients.

2.    On information and belief, defendant Dror Ben-Zeev, Ph.D. ("Dr. Ben-Zeev") is an individual domiciled in the state of Washington.

### Jurisdiction and Venue

3.    This court has specific personal jurisdiction over Dr. Ben-Zeev pursuant to the Massachusetts Long Arm Statute, G.L. c. 223A § 3. This action arises out of Dr. Ben-Zeev's transacting of business in the Commonwealth, specifically his entering into that certain Intervention Content License Agreement dated as of April 7, 2015 (the "License Agreement," a true and accurate copy of which is attached hereto as Exhibit A) with Pear, a Massachusetts-based company. In the negotiation, formation and performance of the License Agreement, Dr.

1

Ben-Zeev participated in multiple phone calls with Pear's executives and employees, almost all of whom are based in Massachusetts. Dr. Ben-Zeev also came to Pear's offices in Boston, Massachusetts, to meet with Pear personnel. Dr. Ben-Zeev's purported termination of the License Agreement that gives rise to this action was addressed to Pear's Chief Executive Officer in Massachusetts.

4. Venue is appropriate in this Court pursuant to G.L. c. 223 § 1 as Pear has its primary place of business in Suffolk County.

### Facts

5. Dr. Ben-Zeev owns the copyright to FOCUS™ and related Content, as that term is defined in the License Agreement. (FOCUS™ and the related Content are referred to collectively herein as "FOCUS.") FOCUS is an 'app' for psychosocial intervention for treating mental health conditions including schizophrenia.

6. Pear and Dr. Ben-Zeev entered into the License Agreement as of April 7, 2015. The License Agreement granted Pear a world-wide right and license to include content from FOCUS in Pear's clinical-stage product candidate known as THRIVE™, a prescription digital therapeutic designed to treat schizophrenia. The license terms included the right to sublicense the "Integrated Products" as defined in the License Agreement.

7. Unless terminated pursuant to its terms, the License Agreement is to continue in perpetuity. The License Agreement permits either party to terminate for material breach of the agreement. Pear is permitted to terminate without cause.

8. In reliance on the rights and license provided in the License Agreement, Pear has invested substantial time, money and resources into developing Integrated Products as contemplated by the License Agreement.

2

9.     On February 28, 2018, Pear entered into a Collaboration and License Agreement (the "Collaboration Agreement") with a major third party pharmaceutical company pursuant to which Pear sublicensed the Integrated Products to the third party and Pear continued its efforts of developing the Integrated Products into a clinically validated, digital therapeutic under the auspices of the Collaboration Agreement.

10.     Pear's counterparty to the Collaboration Agreement has also invested substantial time, money and resources creating and developing Integrated Products, including a feasibility study that commenced earlier this year and a clinical trial that is scheduled to commence in the fourth quarter of this year.

11.     Dr. Ben-Zeev expressed satisfaction with the Collaboration Agreement before and immediately after Pear entered into it.

12.     Dr. Ben-Zeev later began to complain to Pear about the terms of the License Agreement and the interaction between the Collaboration Agreement and the License Agreement.

13.     Pear worked with Dr. Ben-Zeev to try to resolve his concerns in a way that would not impact clinical trials or the interests of patients and entered into good faith negotiations.

14.     After Pear did not accept Dr. Ben-Zeev's proposal to amend the License Agreement substantially in his favor, Dr. Ben-Zeev purported to terminate the License Agreement.  On August 9, 2018, counsel for Dr. Ben-Zeev sent a letter (the "Default Notice") to Pear in Massachusetts alleging material breaches of the License Agreement and purporting to terminate the License Agreement.  A true and accurate copy of the Default Notice is attached hereto as Exhibit B.

15.     The first breach alleged by Dr. Ben-Zeev is "sublicensing Licensor's content to a third party when not so authorized under the License Agreement."

16.     There has been no such breach of the License Agreement because the License Agreement explicitly and implicitly authorizes Pear to sublicense Integrated Products, which by definition include the content contained in FOCUS.

17.     Section 2.1.4 of the License Agreement grants Pear the right and license to "distribute and sublicense the Integrated Products to its Users and for such Users to access and use the Content as part of the Integrated Products." This is an express, unambiguous permission to sublicense. The License Agreement expressly refers to sublicenses in at least five different places.

18.     Section 3.2.2 requires Pear to "provide a summary of material terms of any distribution or other licensing agreements with third parties for the Integrated Products prior to entering into any such agreements."

19.     Dr. Ben-Zeev was informed of the Collaboration Agreement prior to Pear entering into it and praised the agreement before and after Pear entered into it. For example:

- On February 12, 2018, Dr. Ben-Zeev sent an email that he characterized as a follow-up to his conversations with Pear personnel and in which he cited Section 3.2.2 and asked for more details about the potential Collaboration Agreement. Dr. Ben-Zeev then added, "To be clear, I am delighted that Pear is developing partnerships to move things forward. I certainly want to support those in a positive and productive manner, as best I can."

- On March 1, 2018, Pear provided Dr. Ben-Zeev a summary of material terms of the Collaboration Agreement. Dr. Ben-Zeev responded by email the same

day, "Thanks for the information Antoun--I appreciate the transparency. This is truly terrific; Well done Corey and team! I'm sure an enormous amount of work went into cultivating the relationship, developing, and constructing this agreement. Very exciting business-wise and very exciting to see the concrete commitment to developing a resource for people with schizophrenia."

- On March 6, 2018, Dr. Ben-Zeev again congratulated Pear on the Collaboration Agreement and wrote, "please let me know if I can be helpful or supportive as you kick off the rapid development and testing!"

20. The second breach alleged by Dr. Ben-Zeev is "failing to provide to Licensor product data in accordance with Section 3.2.1" of the License Agreement.

21. Pear has not breached Section 3.2.1 of the License Agreement.

22. Section 3.2.1 does not provide a timeline by which the parties are to produce product data. Dr. Ben-Zeev apparently agrees as Pear is waiting on Dr. Ben-Zeev to provide data to Pear as required under the License Agreement.

23. The third breach alleged by Dr. Ben-Zeev is "failing to obtain Licensor's express written permission in accordance with Exhibit D Section 7.11 before publicly announcing a business relationship between Licensor and Pear."

24. Pear has not breached Exhibit D Section 7.11 of the License Agreement, which expressly provides that "either party will be entitled, without the other party's consent, to publicly disclose the fact of the partnership contemplated by this [License] Agreement, but not the specific commercial terms of the [License] Agreement."

25. Pear has not publicly disclosed the commercial terms of the License Agreement.

26. Further, on August 26, 2016, nearly two years before the Default Notice, Dr. Ben-Zeev requested an addendum to a Pear press release that had publicly disclosed the partnership between Dr. Ben-Zeev and Pear. The addendum, requested and approved by Dr. Ben-Zeev and published by Pear, did not retract the disclosure of the partnership; to the contrary, it explicitly connected Dr. Ben-Zeev's FOCUS™ to Pear's THRIVE™.

27. The fourth breach alleged by Dr. Ben-Zeev is a violation of Section 3.1.3 of the License Agreement by "Pear's repeated use of Licensor's confidential information and data for use in scientific conference posters and presentations without Licensor's prior authorization. Specifically Licensor's unpublished data was presented by Pear at the HealthTech Women and the NIG Health Technology scientific meetings."

28. Dr. Ben-Zeev contends that this breach cannot be cured and, therefore, the License Agreement is to terminate 31 days from the date of the Default Notice.

29. Pear has not breached Section 3.1.3 of the License Agreement.

30. Pear's presentation of Dr. Ben-Zeev's data at the HealthTech Women and NIG Health Technology meetings was limited to attributed references to data in articles Dr. Ben-Zeev published in the peer-reviewed publications *JMIR Mental Health*, *Schizophrenia Bulletin* and *Psychiatric Rehabilitations Journal*. Pear did not present any confidential or unpublished data from Dr. Ben-Zeev.

31. Any breach of Section 3.1.3 can be cured by Pear and therefore provides no basis for termination of the License Agreement.

32. Dr. Ben-Zeev also alleged that Pear anticipatorily breached the License Agreement "by reason of Pear's repeated statements that it does not intend to comply with the payment provisions of the License Agreement."

33.     Pear has never stated that it "does not intend to comply with the payment provisions of the License Agreement."

34.     Pear has complied with the payment provisions of the License Agreement and has made payments to Dr. Ben-Zeev pursuant to those provisions. Pear intends to continue complying with the payment provisions of the License Agreement and has told Dr. Ben-Zeev so.

35.     Pear and Dr. Ben-Zeev disagree on the interpretation of certain elements of the payment provisions in the License Agreement.

36.     In the event the Court finds that Dr. Ben-Zeev's interpretation of the payment provision is correct, Pear intends to pay any amounts that would be due to Dr. Ben-Zeev under that interpretation of the agreement.

37.     In the alternative, to the extent there has been any breach of the License Agreement by Pear, such breach was not material.

38.     Dr. Ben-Zeev's threatened termination of the License Agreement jeopardizes Pear's ability to continue to develop Integrated Products it created for patients suffering from schizophrenia. Resolution of the parties' disagreement as to the status of the License Agreement will provide Pear certainty as it moves forward with its efforts to develop and commercialize a prescription digital therapeutic for the treatment of patients with schizophrenia.

## COUNT I – DECLARATORY JUDGMENT PURSUANT TO M.G.L. c. 231A § 1

39.     Pear repeats and re-alleges the allegations contained in paragraphs 1–38 above.

40.     An actual controversy exists between Pear, on the one hand, and Dr. Ben-Zeev, on the other hand, as to whether the License Agreement has been materially breached by Pear, whether those breaches can be cured and whether the License Agreement has been effectively terminated.

41. Specifically, Dr. Ben-Zeev has asserted that Pear has materially breached the License Agreement in four ways and has anticipatorily breached the License Agreement. Dr. Ben-Zeev contends that one of the breaches cannot be cured and, therefore, the License Agreement will terminate within 31 days of the date of the Default Notice.

42. Pear contends that it has not breached the License Agreement or anticipatorily breached the License Agreement or, if it has, that no such breach is material. Pear further contends that any material breach can be cured. For those reasons, Pear contends that Dr. Ben-Zeev's purported termination of the License Agreement is ineffective.

43. The Court should declare that Pear has not materially breached the License Agreement and, therefore, the purported termination is ineffective and the License Agreement remains in effect according to its terms.

## REQUEST FOR RELIEF

Wherefore, Plaintiff Pear Therapeutics, Inc. respectfully requests that this Court grant the following relief:

A. Enter judgment for Plaintiff against the Defendant on all counts of this Complaint;

B. Issue a declaratory judgment that:

- Pear has not materially breached the License Agreement;

- Dr. Ben-Zeev's purported termination of the License Agreement is ineffective; and

- the License Agreement remains effective pursuant to its terms.

C. Grant any such other relief that the Court deems just and proper.

Respectfully Submitted,

PEAR THERAPEUTICS, INC.,

By its attorneys,

Michael P. Boudett, BBO #558757
Richard G. Baldwin, BBO #670984
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1000
Fax: 617-832-7000
mboudett@foleyhoag.com
rbaldwin@foleyhoag.com

Dated: August 15, 2018

**EXHIBIT A**



**INTERVENTION CONTENT LICENSE AGREEMENT**

THIS INTERVENTION CONTENT LICENSE AGREEMENT (the "*Agreement*") is made as of April 7th, 2015 (the "*Effective Date*") by and between Pear Therapeutics, Inc. ("*Pear*"), a Delaware corporation having its principal place of business at 55 Temple Place, Floor 3, Boston MA 02111, and Dror Ben-Zeev. ("*Licensor*"), having his principal place of business at 52 Oak Ridge Road, West Lebanon, NH 03784.

WHEREAS Licensor owns a technology-delivered intervention called FOCUS, which is a psychosocial intervention for treating mental health conditions including schizophrenia, as described more fully in Exhibit B (the "*Intervention*");

WHEREAS, Licensor licenses the Intervention. The Intervention includes, written text, clinical treatment logic, data collection algorithms, video and audio which can only be used as templates for recreation of novel Pear content which does not include any of the individuals captured, taped, or depicted in the original FOCUS content, and all applicable intellectual property, know-how, clinical data, and sample user interface modules. (The Content, and the Intervention, collectively, the "*Licensor Products*"); and

WHEREAS Pear desires to obtain access to the Licensor Products in order to allow Pear to embed a customized version of the Licensor Products into its own software and content offerings (i.e., the Pear Intervention) in order to create Integrated Products for use by healthcare professionals and patients worldwide, subject to the terms and conditions set forth in this Agreement; and

WHEREAS Licensor is willing to enter into an agreement with Pear whereby Licensor will provide Pear with access to the Licensor Products in order for Pear to create Integrated Products and provide them to Pear's Users, on the terms set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

**1. DEFINITIONS.**

Capitalized terms used but not defined in the body of this Agreement are used with the meanings ascribed to them in Exhibit A. The meanings given to terms in this Agreement are equally applicable to both the singular and the plural forms of the terms as the context may require.

**2. LICENSE.**

2.1 Grant of Licenses. Subject to the terms of this Agreement, including payment of the Fees set forth in Section 5, Licensor hereby grants Pear a worldwide, royalty-free, non-transferable (except as permitted in the Agreement) right and license under the Licensor IP:

2.1.1 to use the Licensor Products to create Integrated Products for commercial use will include the right to use the Licensor Products in Integrated Products that constitute drug/software combinations, where software is offered as part of a pharmaceutical product;

2.1.2 to use, copy, distribute and modify the components of Licensor Products in order to create Integrated Products. The Integrated Products may be offered as part of a comprehensive offering which may include, without limitation, compliance software, medical support, and data outcomes monitoring, separately created by Pear or others;

2.1.3 to re-brand the Intervention and the other components of the Licensor Products with marks of Pear's choosing when used as part of the Integrated Products, provided that Licensor is clearly identified as creator of the Intervention and Content (e.g., "powered by FOCUS" or comparable ingredient branding agreed upon by the parties;

1



2.1.4    to distribute and sublicense the Integrated Products to its Users and for such Users to access and use the Content as part of the Integrated Products. Pear's license rights in this Section 2.1 include the right for Pear to provide access to the Integrated Products to its Users directly or indirectly through Pear's Distributors, OEMs and resellers; and

2.1.5    to use the Integrated Products in clinical validation studies.

2.1.6    The license rights granted above to Pear by Licensor will be exclusive with respect to the rights granted in Subsection 2.1.1 with respect to Integrated Products that constitute drug/software combinations where software is offered as part of a pharmaceutical product, and non-exclusive with respect to the other rights granted to Pear under Section 2.1. Pear will not be under any obligation to use the Licensor Products and/or the Content in any manner whatsoever unless it so chooses.

2.2    Restrictions.    Except as expressly permitted in this Agreement, Pear will not (and will not permit third parties to):

(a)    distribute, rent, or otherwise transfer any rights in the Licensor Products in any way except as part of an Integrated Product (i.e., Pear may not distribute the Licensor Products on a standalone basis);

(b)    except as necessary in the creation of Integrated Products, modify the Intervention;

(c)    reverse engineer, decrypt, decompile, or disassemble the Licensor Products;

(d)    use the Licensor Products in any manner or for any purpose not authorized by Section 2.1;

(e)    use the existing video, audio, and/or images contained in the Licensor Products to create Integrated Products;

(f)    brand Integrated Products using only the word FOCUS without prior consent from Licensor.

## 3.    RESPONSIBILITIES OF THE PARTIES.

3.1    Responsibilities of Licensor.    Licensor will have primary responsibility for performing the following tasks and providing the following services:

3.1.1    Delivery.    Licensor will deliver the Licensor Products in the manner set forth in Exhibit B.    Unless otherwise specified in Exhibit B, Supplier will deliver all Licensed Products electronically to the location(s) designated by Pear. Supplier will deliver patches, updates, and upgrades to the Licensed Products in accordance with the terms set forth in Exhibit B.

3.1.2    Integration.    Licensor will work with Pear, for a total time not to exceed 30 hours over the course of one year following the Effective Date, to utilize the Licensor Products to create Integrated Products; both parties will work in good faith to insure that the integration will not materially adversely impact the core functionality of the Intervention. At the end of the 30hr time period above, the parties will continue to work together and Pear shall reimburse the Licensor at $200 per hour.

3.1.3    Clinical validation.    Clinical data for the FOCUS intervention was collected in the context of research studies. Where feasible (i.e., when there are no restrictions associated with study Institutional Review Board authorizations, study funder regulations and requirements, and if the Licensor's study co-investigator are amenable), Licensor will provide Pear with access to newly created clinical data involving the Intervention as well as, where feasible, access to all existing clinical data involving the Intervention. Pear may not use/ repurpose these data for academic purposes including preparation and publication of scientific journal articles and scientific conference posters without the Licensor's authorization. Upon request and subject to mutually agreeable terms with respect to


time and payment, Licensor may assist Pear in the design for clinical validation studies, including the composition of grant applications for clinical validation studies. Costs associated with these activities shall be covered by Pear at reasonable rates to be agreed by both parties.

3.1.4    Reserved.

3.1.5    Additional Services. Licensor shall provide any other services reasonably requested by Pear subject to the parties entering into an agreement on mutually acceptable terms. Without limiting the generality of the foregoing, and by way of illustration, Licensor will commit on a case by case basis, to provide support for partnership discussions with branded or generic pharmaceutical companies, pharmacy chains, or other with potential distribution partners for Integrated Products, with the number of hours, rates and fees to be mutually agreed by the parties in writing as an addendum to this Agreement, prior to the commencement of any such work.

3.2    Responsibilities of Pear.

3.2.1    Data provided to Licensor. Subject to the Confidentiality provisions in Exhibit D, Pear will provide Licensor with access to any evaluations, methodology and the data produced through use of the Integrated Products that Pear's partners/licensor allow Pear to access and provide (collectively, "Product Data") in Licensor's marketing and communications in a form and content of which will be mutually agreed; provided that, Licensor may only use such Product Data for Licensor's internal research purposes only. Without limiting the generality of the foregoing, and by way of illustration, (a) Licensor may not use any Product Data to target market any end users on behalf of a competitive product or services; (b) the Product Data will not contain any personally identifiable information; and (c) such Product Data will be owned by Pear.

3.2.2    Third Party Partnerships. Subject to any applicable confidentiality obligations that may apply, Pear will provide a summary of material terms of any distribution or other licensing agreements with third parties for the Integrated Products prior to entering into any such agreements.

3.3    Mutual Obligations of the Parties. Pear will respond to any support requests arising from Users that relate specifically to the Pear Customizations or any Pear functionality or data contained in the Integrated Product. Licensor will provide Pear (but not customers) with high level telephone and email support regarding any and all technical issues arising from the Licensor Products themselves that Pear is unable to resolve; these support services will be delivered in accordance with Licensor's standard support practices for this level of support.

4.    HIPAA REQUIREMENTS.

4.1    Compliance with HIPAA. Licensor acknowledges that any Pear Data transmitted to Licensor hereunder may be subject to federal and state laws, rules and regulations relating to among other subjects, the confidentiality, privacy or security of patient information, including without limitation, the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191,45 C.F.R. Part 160, 162, 164 ("HIPAA") and the applicable regulations promulgated thereunder. The parties will at all times comply with the applicable provisions of such laws, rules, and regulations and with the applicable corporate policies and provision of the parties, with respect to the performance of their obligations under this Agreement, with respect to the confidentiality, privacy and security of Protected Health Information ("PHI") and electronic Protected Health Information, as defined in 45 C.F.R. § 164.501 ("ePHI"). For purposes of this Agreement, PHI means individually identifiable information as defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164.

5.    FEES.

5.1    License Fees. Pear will pay Licensor the license fees set forth in Exhibit B (the "License Fee"). The License Fees authorize Pear and its Users to access the Integrated Products for the period identified in Exhibit B (the "License Term").



5.2  Reimbursement of Expenses.  Pear will reimburse Licensor for all reasonable out-of-pocket expenses incurred by Licensor in performing services under this Agreement provided such expenses are approved in writing by Pear in advance.  Such out-of-pocket expenses may include: (a) All reasonable travel expenses, other than for normal commuting, including airfares, rental vehicles, and highway mileage in company or personal vehicles at the then current IRS approved rate, and meals and lodging; and (b) All other reasonable expenses resulting from the Services provided under this Agreement, as applicable.  Licensor shall submit an itemized statement of Licensor's expenses due under this Section 5.2, including receipts and other documentation, on a monthly basis.  Pear shall reimburse Licensor within thirty (30) days from the receipt of each statement by Pear.

6.    STANDARD LEGAL TERMS AND CONDITIONS:  The Standard Legal Terms and Conditions governing this Agreement are contained in Exhibit D and incorporated herein by reference

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

PEAR THERAPEUTICS, INC.:                          Dror Ben Zeev, Ph.D.:

By:_____                                        By:_____
Name:_____                                      Name:_____
Title:_____                                     Title:_____
Date:_____                                      Date:_____

4



## EXHIBIT A

## DEFINTIONS

*"Affiliate"* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this Agreement, "control" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*"Intervention"* has the meaning set forth in the first Recital to the Agreement, and as further described in Exhibit B.

*"Confidential Information"* means any and all information disclosed or made available by either party to the other, including orally conveyed information, in connection with this Agreement that is: (a) at the time of disclosure identified or marked as confidential or proprietary information; or (b) by its nature and the circumstances should be considered, or is reasonably obvious to be confidential information. Confidential Information shall be deemed to include the Pear Data, if any, supplied by Pear to Licensor pursuant to this Agreement. Confidential Information does not include any information that the receiving party can demonstrate is: (a) rightfully known prior to disclosure; (b) rightfully obtained from a third party authorized to make such a disclosure, without breach of the terms and conditions of this Agreement or other binding confidentiality obligation; (c) independently developed by the receiving party; (d) available to the public without restrictions; (e) approved for disclosure with the prior written approval of the disclosing party; or (f) disclosed by court order or as otherwise required by law, provided that the party required to disclose the information provides prompt advance notice to enable the other party to seek a protective order or otherwise prevent such disclosure.

*"Content"* means audio and visual information, documents, products and services contained in the Intervention or made available to Pear in the course of using the Licensor Products.

*"Distributor"* means a third party distributor or agent that is not a sublicensee that Pear an Affiliate or a sublicensee utilize for purposes of Integrated Product distribution in a particular country(ies). A Distributor places orders for Integrated Products (or services provided through the use of Integrated Products) from Pear or its Affiliates or sublicensees for distribution to customers in the applicable country(ies); a Distributor does not itself hold rights to make, have made, use, sell, lease, or import Integrated Products (or services provided through the use of Integrated Products), but may hold the right to resell the units of such Integrated Products (or services provided through the use of Integrated Products) it acquires from Pear, an Affiliate or a sublicensee to Users in the applicable country(ies).

*"Integrated Product"* means the product resulting from the integration of the Licensor Product with a Pear Application. The Integrated Product will be delivered using a "Pear Wrapper" –i.e., a customized version of the Intervention for use by Pear and its Users, with compliance and other layers and allow Users to access content contained in the Licensor Products, and will be hosted on servers owned and/or controlled by Pear.

*"License Term"* means the period identified in Exhibit B for which Pear will have access to the Licensor Products.

*"Licensor IP"* means collectively, the Licensor Products made available to Pear by Licensor under the Agreement, including any know-how, and clinical data related to the Intervention, and all trademarks licensed by Licensor to Pear under the Agreement.



*"**Licensor Products**"* has the meaning set forth in the second Recital to the Agreement, and is as further described in **Exhibit B.**

*"**Pear Intervention**"* means the portions of any Integrated Product that are created by Pear.

*"**Pear Customizations**"* means any proprietary scripts, macros, modules or software developed by Pear or Licensor to customize Pear's use of, or access to, the Licensor Products as part of Integrated Products.

*"**Pear Data**"* means any data, information or material that Pear and/or Pear's Users submit to or receive from the Integrated Products, as well as all clinical data from clinical studies involving any Pear resources.

*"**Pear IP**"* means collectively, the Integrated Products (excluding the portions that constitute Licensor IP); the Pear Application; the Pear Customizations; the Pear Data; Pear trademarks; and the Pear-Owned Property, as well as any and all improvements to IP, improvements to source code.

*"**Pear-Owned Property**"* means all tangible and intangible items or information that Licensor receives from Pear or from a third party on Pear's behalf, or that is paid for by Pear, including but not limited to Pear Data and Pear Customizations.

*"**Person**"* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization, other than Pear or Licensor.

*"**Users**"* means the users of the Integrated Products.



**EXHIBIT B – LICENSE SCHEDULE**

**LICENSE TERMS AND FEES**

This License Schedule sets forth the terms and conditions for a license for the use of the Licensor Products, as identified below. Except as expressly modified by this License Schedule, the terms and conditions of the Agreement govern the license to the Licensor Products.

(1)  **LICENSE TERM.**

The license term begins on the Effective Date and will continue, unless sooner terminated, in accordance with the Agreement, in perpetuity.

(2)  **DESCRIPTION OF LICENSOR PRODUCTS.**

The Licensor Products include the following intervention content:

Self-assessment measures and intervention content focusing on coping with auditory hallucinations, medication use, social functioning, mood regulation, and sleep.

A fully functioning version of FOCUS.

(3)  **UPGRADES.**

Licensor shall provide Pear, at no additional cost with all upgrades, updates, improvements, and enhancements to the Licensed Products that Licensor develops through his research activities (collectively, "Upgrades"). Licensor will provide Pear with the same testing instructions and description of the new functionality or features of all Upgrades that it provides to its other customers. Any Upgrades shall automatically be included within the definition of Licensed Products.

(4)  **FEES.**

A) License Fees. In connection with the licenses granted in this Agreement, Pear will pay Licensor as follows:

(i) Royalties. Licensor will be paid a royalty equal to 5% of Net Revenue during the Term. Pear will provide payments to Licensor within ninety (90) days after receipt of the corresponding payments from such third parties of the Integrated Products. Pear will provide reports along with license payments hereunder in sufficient detail to illustrate the basis for the payments made, including the number of units of Integrated Products sold (or units of services provided through the use of Integrated Products), the gross price charged for such units, calculation of Net Revenue, including a listing of the deductions taken, the total royalty payable in U.S. Dollars, together with the exchange rates used for any currency conversion and the number of sublicenses granted.

If Pear or any Affiliate sells or leases Integrated Products (or services provided through the use of Integrated Products) in connection with other products or services for a bundled price, Pear covenants that it shall not, and that it shall cause its Affiliates to not apply any such discount in a manner that is applied in a manner that has disproportionate affect on the Integrated Products (or services provided through the use of Integrated Products).



*"Net Revenue"* means the gross amount received by Pear or its Affiliates from any independent third party sublicensee, Distributor or any end user for Integrated Products (or services provided through the use of Integrated Products), less: (i) customary trade, quantity, or cash discounts to the extent actually allowed and taken; (ii) amounts repaid or credited by reason of rejection or return; (iii) to the extent separately stated on purchase orders, invoices, or other documents of sale, any taxes or other governmental charges levied on the production, sale, transportation, delivery, or use of Integrated Products (or services provided through the use of Integrated Products) that is paid by or on behalf of pear; and (iv) outbound transportation costs prepaid or allowed and costs of insurance in transit. No deductions shall be made for commissions paid to individuals whether they are with independent sales agencies or regularly employed by Pear and on its payroll, or for cost of collections. Net Revenue shall occur on the date Pear receives payment for an Integrated Product (or services provided through the use of Integrated Products). If an Integrated Product (or services provided through the use of Integrated Products) is distributed at a discounted price that is substantially lower than the customary price charged by Pear, or distributed for non-cash consideration (whether or not at a discount), Net Revenue shall be calculated based on the non-discounted amount of the Integrated Product (or services provided through the use of Integrated Products) charged to an independent third party during the same period or, in the absence of such sales, on the fair market value of the Integrated Product (or services provided through the use of Integrated Products). For the avoidance of doubt, the preceding sentence shall not apply with respect to units of Integrated Products (or services provided through the use of Integrated Products) distributed for clinical study purposes.

Net Revenue will be calculated only once with respect to each unit of Integrated Product (or services provided through the use of Integrated Products) sold by Pear, any Affiliate or any sublicensee to any Distributor or end user, even if such Integrated Product (or services provided through the use of Integrated Products) is sold more than once in the course of its transfer to the ultimate end-user; with the transfer or sale of Integrated Product (or services provided through the use of Integrated Products) between Pear and an Affiliate or sublicensee not being included in Net Revenue, unless such transfer or sale is a final purchase by Pear or the Affiliate or sublicensee, without the intent to further sell, transfer or distribute to a third party.

Non-monetary consideration shall not be accepted by Pear or any Affiliate or sublicensee for any Integrated Products (or services provided through the use of Integrated Products), without the prior written consent of Licensor. In the event that non-monetary consideration is received for Integrated Product (or services provided through the use of Integrated Products), Net Revenue shall be calculated based on the fair market value of such non-monetary consideration (including all elements of such consideration), as determined by the parties in good faith. For the avoidance of doubt, it is understood and agreed that non-monetary consideration (e.g., data) received in the context of clinical validation studies or sponsored research where Integrated Products are not being commercially sold shall not be considered a violation of this clause.

If a unit of Integrated Product (or services provided through the use of Integrated Products) is leased to a Distributor or end user rather than sold to such Distributor or end user, then Net Revenue in respect of such units of Integrated Product (or services provided through the use of Integrated Products) shall be calculated on an annual basis and shall equal the aggregate lease payments paid by the Distributor or end user for the use of such unit of Integrated Product (or services provided through the use of Integrated Products).

(ii) License Maintenance Fee. Pear shall pay to Licensor the following license maintenance fees within 30 days after the dates set forth below:

Effective Date                                             $30,000
First and each subsequent anniversary of the Effective Date    $15,000

(iii) Milestones. In addition to the above royalty, milestone payments will be paid as follows; 1) $200,000 paid to Licensor on US regulatory approval of an Integrated Product that constitutes a drug/software



combination, where software is offered as part of a pharmaceutical product, and 2) $200,000 paid to Licensor on first US commercial sale of an Integrated Product that constitutes a drug/software combination, where software is offered as part of a pharmaceutical product.

(iv) Inspections. Pear shall maintain, and shall cause its Affiliates and sublicensees to maintain, complete and accurate records relating to the rights and obligations under this Agreement and any amounts payable to Licensor in relation to this Agreement, which records shall contain sufficient information to permit Licensor to confirm the accuracy of any reports delivered to Licensor and compliance in other respects with this Agreement. The relevant party shall retain such records for at least one (1) year following the end of the calendar year to which they pertain, during which time Licensor, or Licensor's appointed agents, shall have the right, at Licensor's expense, to inspect such records during normal business hours to verify any reports and payments made or compliance in other respects under this Agreement. In the event that any audit performed under this Section 4 reveals an underpayment in excess of ten percent (10%), Pear shall bear the full cost of such audit and shall remit any amounts due to Licensor within thirty (30) days of receiving notice thereof from Licensor

(5)    **THIRD PARTY PRODUCTS** The Licensor Products are configured for operation with certain commonly available off the shelf software products listed below. Pear may require different third party licenses for Integrated Products depending upon the manner in which they are configured and deployed.

(6)    **DELIVERY**.

Within 30 days of the Effective Date, Licensor will ship to Pear a USB Flash drive containing the Licensor Products. Licensor will make Upgrades available to Pear, as soon as they are available, by shipping USB Flash Drives containing the relevant content



**EXHIBIT C**

Reserved



**EXHIBIT D**

**Standard Legal Terms and Conditions**

1. **Ownership.**

1.1　Title to Licensor Products. Pear acknowledges that title to the Licensor IP made available to Pear by Licensor under this Agreement is and will remain the sole property of Licensor. Pear acknowledges that it has no proprietary interest in or right to use the Licensor IP or the Licensor Products except in accordance with the terms of the licenses granted in this Agreement.

1.2　Title to Pear IP. Subject to its underlying rights in the Licensor Products, Licensor acknowledges that title to the Pear IP is and will remain the sole property of Pear. Without limiting the generality of the foregoing and by way of illustration only, Licensor acknowledges that it has no proprietary interest in or right to use the Pear Data or the Pear-Owned Property except in accordance with the express terms of this Agreement.

1.3　Assignment. To the extent that Licensor has or at any time acquires any right, title or interest in or to any Pear Data, Integrated Products (excluding Licensed Products), Pear Customizations or any other Pear IP, Licensor hereby assigns all of such right, title and interest, including all copyrights, patents and other intellectual property rights, in and to such Pear IP to Pear. On request from Pear, Licensor shall execute any documents necessary to confirm and perfect Pear's ownership of the Pear IP, at no additional cost to Pear.

2.　Confidentiality. Neither party will use any Confidential Information of the disclosing party except as expressly permitted in this Agreement or as expressly authorized in writing by the disclosing party. Each party shall use the same degree of care to protect the disclosing party's Confidential Information as it uses to protect its own Confidential Information of like nature, but in no circumstances less than reasonable care. Neither party is allowed to disclose the other party's Confidential Information to any person or entity other than the receiving party's officers, employees, consultants and legal advisors who need access to such Confidential Information to effectuate the intent of the Agreement. Each party agrees to notify the other of any unauthorized use or disclosure of Confidential Information and to provide reasonable assistance to such other party, and its licensors, in the investigation and prosecution of such unauthorized use or disclosure.

3.　Warranties. Licensor represents and warrants each of the following:

3.1　Title. Licensor has title or the right to grant licenses to the Intervention and the Licensor Products in accordance with the terms of this Agreement and without the obligation to pay third parties in respect of such licenses by Licensor.

3.2　Performance. The Intervention and Licensor Products, and any Upgrades shall substantially conform to their Specifications; provided however, that the foregoing warranty will not apply to the extent the Licensor Products are modified by Pear or used beyond the scope of the licenses granted in this Agreement.

3.3　Reserved.

3.4　Other Licenses. The performance of this Agreement and Pear's use of the Licensor Products will not require any license to use the intellectual property of a third party, except as otherwise expressly set forth on Exhibit B.



3.5     No Viruses. The Licensor Products will be tested with commercially available anti-virus software to detect the presence of any viruses, worms, disabling programming codes, instructions or other such items that may threaten, infect, damage, disable or otherwise interfere with the permitted use of the Licensor Products ("*Virus*") and Licensor shall not deliver any Licensed products to Pear unless the Licensed products pass such tests.

3.6     Malicious Technology: The Licensor Products as delivered to Pear will not: (i) contain any Malicious Technology, (ii) contain any files or features that will disable or destroy any functionality of the Licensor Products, (iii) monitor Pear's or its Users' use of the Integrated Products; (iv) replicate, transmit or activate itself without control of a person operating the computing equipment on which it resides; or (v) alter, damage or erase any data or computer programs without control of a person operating the computing equipment on which it resides. If the Licensor is in breach of this Section, no "right to cure" period will apply. Pear reserves the right to pursue any available civil or criminal action against Licensor for violation of this provision. Licensor will not install, use or execute any software on any Pear CPUs without Pear's written approval. "*Malicious Technology*" means any software, electronic, mechanical or other means, device or function , *e.g.* (key node, lock, time-out, "back door," trapdoor," "booby trap," "drop dead device," "data scrambling device," "Trojan Horse,") that would allow Licensor to: (i) monitor or gain unauthorized access to any Pear system, (ii) use any electronic self-help mechanism or (iii) restrict, disable, limit or impair the performance of a Pear system or network.

3.7     Compliance with Laws. Licensor will comply with all applicable laws, orders, codes and regulations in the performance of this Agreement, including, if applicable, those regarding privacy and security of protected health information. Licensor warrants that it has not at any time been disbarred or excluded from participation in any federal healthcare program, nor is Licensor under investigation or consideration for such disbarment or exclusion. Licensor will obtain and keep current at its expense all governmental permits, certificates and licenses (including professional licenses, if applicable) necessary for Licensor to grant the licenses under this Agreement. Licensor will proactively and cooperatively work with and assist Pear in a timely manner to ensure that the Licensor Products have been effectively tested and complies with all legal requirements prior to or contemporaneously with the effective date of such legal requirements.

3.8     Good Standing. Licensor (i) is validly existing and in good standing, and is qualified to do business, in each jurisdiction where it will conduct business under this Agreement; (ii) the signing, delivery and performance of this Agreement by the party has been properly authorized; and (iii) no claims, actions or proceedings are pending or, to the knowledge of the party, threatened against or affecting the party that may, if adversely determined, reasonably be expected to have a material adverse effect on the party's ability to perform its obligations under this Agreement.

3.9     Open Source. The Licensed Products are not subject to any Open Source License requirements that would give rise under applicable open source license agreements to any rights in any third parties with respect to the Licensed Products or any derivative works, or obligations for Pear to disclose or distribute the Integrated Products in source code form or to license the Integrated Products for the purpose of making derivative works, or to distribute Integrated Products without charge. "Open Source License" means a software license under which source code is made available under terms allowing a licensee to copy, create derivative works and distribute the software without fee or cost.

4.      Indemnification.

4.1     Indemnification. (a) Subject to the provisions of Section 4.1(c), Licensor shall defend, indemnify and hold harmless Pear and its affiliated entities, and all of their officers, directors, employees, agents, successors and assigns from and against any and all claims, proceedings, damages, injuries, liabilities,



losses, costs and expenses (including reasonable attorney's fees and litigation expenses) (*"Losses"*) arising from any third party claim: that the Licensor Products infringe any intellectual property right of any third person. Licensor shall have no liability or obligation to LICENSEE under this Section 4.1(a) with respect to any infringement claim in the event and to the extent based upon: (i) use of the Licensor Products in an Intervention or environment or on a platform or with devices for which the Licensor Products was not designed or contemplated; (ii) modifications, alterations, combinations or enhancements of the Licensor Products not created or authorized by Licensor; (iii) any patent, copyright or trademark in which Pear or any Affiliate has an interest; (iv) the combination of Licensor Products with other software, hardware, products, processes, methods, or Interventions not furnished by Licensor where no such claim would be possible had such combination not taken place; (v) failure of Pear to install Upgrades to the Licensor Products provided by Licensor; or (vi) Pear continuing its infringing activities after being notified of such infringement by Licensor. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of any indemnified party's negligence, intentional misconduct or breach of this Agreement, or is the subject of Section 4.1(b).

(b) Subject to the provisions of Section 4.1(c), Pear will defend, indemnify and hold harmless Licensor and its affiliated entities, and all of their officers, directors, employees, agents, successors and assigns from and against any and all Losses arising from any third party claim to the extent arising from or related to: use, sale or other disposition by Pear or by any party acting on behalf of or under authorization from Pear, of Integrated Products to the extent such Losses are not otherwise subject to indemnification by Licensor under the terms of Section 4.1(a). The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of any indemnified party's negligence, intentional misconduct or breach of this Agreement, or is the subject of Section 4.1(a).

(c) To receive indemnification under Section 4.1(a) or Section 4.1(b), the party seeking indemnification must promptly notify the indemnifying party in writing of a claim or suit and provide total cooperation and immediately tender to the indemnifying party (and its insurer) full authority to defend or settle the claim or suit. The party seeking indemnification shall cover all costs associated with its defense until the claim is finally resolved at which time the indemnifying party shall reimburse the indemnitee for such costs associated with the prosecution of the claim. Neither party has any obligation to indemnify the other party in connection with any settlement made without the indemnifying party's written consent.

4.2     Disruption of Use of Licensor Products. If a third-party claim subject to indemnification under Section 4.1(a) prevents Pear's use of the Licensor Products, Licensor shall, at Licensor's sole option: (a) replace the Licensor Products, without additional charges, with a functionally equivalent and non-infringing product; or (b) modify the Licensor Products to avoid the infringement; or (c) obtain a license for the Pear to continue use of the Licensor Products and pay for any additional fee required for such license. If none of these are feasible to Licensor's reasonable satisfaction, Licensor will be entitled to terminate this Agreement and will refund to Pear moneys previously paid for the affected portions of the Licensed Products. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE FOREGOING STATES LICENSOR'S ENTIRE LIABILITY AND PEAR'S EXCLUSIVE REMEDY FOR PROPRIETARY RIGHTS INFRINGEMENT.

5.      LIMITATION OF LIABILITY. EXCEPT IN THE EVENT OF BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, OR THIRD PARTY INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES ON ACCOUNT OF LOSS OF PROFITS OR FAILURE TO ACHIEVE ANTICIPATED REVENUES, EVEN IF SUCH DAMAGES WERE WITHIN THE CONTEMPLATION OF THE PARTIES. EXCEPT FOR THIRD PARTY INDEMNIFICATION OBLIGATIONS, OR A BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT WILL EITHER PARTY'S TOTAL AGGREGATE LIABILITY FOR ALL CLAIMS ARISING OUT OF THIS AGREEMENT EXCEED THE AMOUNT PAID OR PAYABLE BY PEAR UNDER THIS



AGREEMENT PRIOR TO THE EFFECTIVE DATE OF THE NOTICE OF ANY SUCH CLAIM. THIS PROVISION APPLIES REGARDLESS OF HOW THE LIABILITY AROSE OR THE THEORY OF LIABILITY, INCLUDING WITHOUT LIMITATION CONTRACT OR TORT (INCLUDING PRODUCTS LIABILITY, STRICT LIABILITY, NEGLIGENCE AND MISREPRESENTATION).

6.    **Term And Termination.**

6.1    <u>Term</u>. The term of this Agreement begins on the Effective Date and will continue for the duration of the License Term (the "Term").

6.2    <u>Termination for Material Breach</u>. If a party materially breaches this Agreement, the other party must give the breaching party a material breach notice, identifying the action or inaction that is the basis of the breach. The party giving the breach notice may terminate this Agreement if the other party does not cure the breach to the reasonable satisfaction of the non-breaching party within thirty (30) days after receiving the breach notice. No breach under this Agreement will constitute a breach under any other agreement, license or schedule between the parties. Unless otherwise provided in the breach notice or unless the breach has been cured to the reasonable satisfaction of the non-breaching party, the termination is effective thirty-one (31) days after the breach notice is given.

6.3    Reserved.

6.4    Reserved.

6.5    <u>Termination Without Cause</u>. Pear may at any time without cause terminate this Agreement upon at least sixty (60) days written notice to Licensor.

6.6    <u>Effect of Termination</u>. Termination of this Agreement is without prejudice to any other right or remedy of the parties. Termination of this Agreement for any reason does not release either party from any liability which, at the time of termination, has already accrued to the other party, or which may accrue in respect of any act or omission prior to termination or from any obligation which is expressly stated to survive the termination.

6.7    <u>Post-Termination Obligations</u>. Upon termination of this Agreement, the parties will perform the following obligations:

(A)    Within fifteen (15) days after the effective date of termination or expiration, each party will return to the other party all Confidential Information of the other party in its possession Licensor will return Pear Owned Property to locations designated by Pear and Pear will return all Licensed Products in its possession;

(B)    Within thirty (30) days after the effective date of termination or expiration, Licensor will invoice Pear for any final amounts accrued prior to the effective date of termination under the Agreement;

(C)    Within one hundred ninety (90) days after the effective date of termination, Pear will terminate availability of access to the Integrated Products. The parties will mutually agree on mechanisms for Licensor to monitor such cessation, which may include a license validation system incorporated into the Integrated Product, and the right to monitor App Store listings; and

(D)    Both parties will immediately discontinue making any statements or taking any actions that might cause third parties to infer that a business relationship continues to exist between the parties under the Agreement, and where necessary or advisable, the parties will inform third parties that the parties no longer have a business relationship.



7.    Miscellaneous.

7.1    Notice. Notices provided under this Agreement must be in writing and delivered by (i) certified mail, return receipt requested, (ii) hand delivered, (iii) facsimile with receipt of a *"Transmission OK"* acknowledgment, (iv) e-mail, or (v) delivery by a reputable overnight carrier service (in the case delivery by facsimile or e-mail the notice must be followed by a copy of the notice being delivered by a means provided in (i), (ii) or (v)). The notice will be deemed given on the day the notice is received. In the case of notice by facsimile or e-mail, the notice is deemed received at the local time of the receiving machine, and if not received, then the date the follow-up copy is received. Notices must be delivered to the following addresses or at such other addresses as may be later designated by notice:

| Pear: | Licensor: |
|-------|-----------|
| Corey McCann | Dror Ben-Zeev |
| 55 Temple Place, Floor 3 | 52 Oak Ridge Road |
| Boston, MA 02111 | West Lebanon, NH |
| Email: cmccann@peartherapeutics.com | Email: benzeevd@gmail.com |

7.2    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, assigns, and legal representatives. Except as otherwise set forth in this Agreement, Pear will not assign any of the licenses granted to it under the Agreement in whole or in part without Licensor's prior written consent; provided however that notwithstanding the foregoing, (i) Pear may assign this Agreement to any successor to its business, including by a purchase or sale of all or substantially all of the assets, stock or business operations, any change of control, acquisition, merger or consolidation of either party into, by, or with another entity, or any other transfer by operation of law (a "Transaction"); and (ii) Pear may hire or contract with third parties of its choice to assist it in fulfilling its obligations and exercising any of its rights pursuant to this Agreement, provided that Pear will remain liable for the subcontractor's performance.

7.3    Access to Books and Records. To the extent that Section 952 of P.L. 96-499 (42 U.S.C. Section 1395x(v)(1)) is applicable to this Agreement, the parties agree as follows: (a) until the expiration of four (4) years after the furnishing of such services pursuant to this Agreement, each party shall make available, upon written request of the Secretary of the U.S. Department of Health and Human Services or upon request of the Comptroller General of the United States, or any of his/her duly authorized representatives, this Agreement, and books, documents and records of such party that are necessary to certify the nature of the duties of this Agreement; and (b) if either party performs its services hereunder through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve (12)-month period, then any such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request of the Secretary of the U.S. Department of Health and Human Services or upon request of the Comptroller General of the United States, or any of his/her duly authorized representatives, the subcontract, and books, documents and records of such organization that are necessary to verify the nature and extent of the cost of services provided pursuant to such subcontract.

7.4    Governing Law. This Agreement shall be governed, interpreted and enforced under and in accordance with the laws of Delaware, excluding its conflicts of law provisions. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

7.5    Unenforceability. Should any of the parties' obligations under this Agreement be found illegal or unenforceable in any respect, such illegality or unenforceability shall not affect the other provisions of the Agreement, all of which shall remain enforceable in accordance with their terms. Any unenforceable



provisions shall be replaced by an enforceable provision effecting the intention of the parties, as determined by the tribunal of fact.

7.6     Currency. All amounts are stated and payable in United States dollars.

7.7     Survival. The following sections of the main body of the Agreement and of this Exhibit D will survive expiration or termination of this Agreement for any reason: Section 4 of the main body of the Agreement ("HIPAA Requirements"); and Sections 1 ("Ownership"), 2 ("Confidentiality"), 3 ("Warranties"), 4 ("Indemnification"); 5 (Limitation of Liability); 6.6 ("Effect of Termination"), 6.7 ("Post-Termination Obligations"), and 7 (Miscellaneous) of this Exhibit D.

7.8     Use of Name. Nothing in this Agreement grants Licensor the right to use any trademarks, trade names or logos proprietary to Pear. If Licensor is granted a right to use such marks, Licensor will do so only in strict compliance with Pear guidelines provided by Pear. All goodwill associated with any use of Pear trademarks will inure to Pear.

7.9     Remedies. All rights and remedies of the parties, under this Agreement, in law or at equity, are cumulative and may be exercised concurrently or separately. The exercise of one remedy will not be an election of that remedy to the exclusion of other remedies.

7.10    Applicability of Laws. Each party will comply with all applicable export laws, obtain any applicable export licenses and will not export or re-export any part of the Licensor Products to any country in violation of such restrictions, or any country that may be subject to an embargo by the United States.

7.11    Public Announcements. Neither party will make any public announcement regarding the business relationship of the parties or this Agreement without the other party's prior express written permission, unless required by law; in which case, the disclosing party will provide the other party as much advance written notice as reasonably possible. Notwithstanding the foregoing, either party will be entitled, without the other party's prior consent, to publically disclose the fact of the partnership contemplated by this Agreement, but not the specific commercial terms of the Agreement. Furthermore, Pear shall be able to disclose the Licensor as an advisor related to Integrated Products contemplated by this agreement.

7.12    Entire Agreement. This Agreement, including Exhibits, all of which are attached, constitute the entire Agreement and understanding between Licensor and Pear concerning the subject matter hereof, and supersedes and terminates all prior written and oral agreements, proposals, promises, and representations of the parties respecting the Service covered by this Agreement. In the event of any conflict or ambiguity between any Exhibit and the terms and conditions set forth in this Agreement, the terms and conditions in this Agreement shall control.

**EXHIBIT B**

August 9, 2018

Corey McCann, Chief Executive Officer
Pear Therapeutics, Inc.
200 State Street
Boston, MA 02109

RE: Default under Intervention Content License Agreement dated April 7, 2015 ("License Agreement") between Dror Ben-Zeev ("Licensor") and Pear Therapeutics, Inc. ("Pear")

Dear Mr. McMann,

In accordance with Exhibit D Section 6.2 of the License Agreement, Licensor hereby provides formal notice of Pear's multiple material breaches of the License Agreement. Specifically, Pear's breaches of the License Agreement include but are not limited to (a) sublicensing Licensor's content to a third party when not so authorized under the License Agreement, (b) failing to provide to Licensor product data in accordance with Section 3.2.1, and (c) failing to obtain Licensor's express written permission in accordance with Exhibit D Section 7.11 before publicly announcing a business relationship between Licensor and Pear. Licensor also provides notice of Pear's anticipatory breach of the License Agreement by reason of Pear's repeated statements that it does not intend to comply with the payment provisions of the License Agreement.

This notice also constitutes Licensor's notice of termination of the License Agreement on the basis of breach of Section 3.1.3 of the License Agreement through Pear's repeated use of Licensor's confidential information and data for use in scientific conference posters and presentations without Licensor's prior authorization. Specifically, Licensor's unpublished data was presented by Pear at the HealthTech Women and the NIH mHealth Technology scientific meetings. In addition, at the HealthTech Women conference Pear also claimed the Licensor was working with Pear on a regular basis to bring the products to market which is untrue. As these breaches cannot be cured, the License Agreement will terminate in accordance with its terms thirty one (31) days from the date of this letter.

Please note the requirements of Exhibit D section 6.7 of the License Agreement which including return of all Licensor confidential information and Licensed Products within fifteen (15) days and termination of availability of access to Integrated Products within ninety (90) days.

Very truly yours,

Margaret Valeur-Jensen, PhD, JD

Seed Intellectual Property Law Group LLP

address  701 Fifth Avenue
Suite 5400
Seattle, WA 98104
telephone  206.622.4900
facsimile  206.682.6031
website  SeedIP.com

| CIVIL ACTION COVER SHEET | DOCKET NO(S) **B.L.S.** | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Pear Therapeutics, Inc. | Dror Ben-Zeev |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number | ATTORNEY (if known) |
|---|---|
| Michael Boudett BBO# 558757 Richard G. Baldwin BBO# 670984 Foley Hoag LLP, 155 Seaport Boulevard, Boston, MA 02210 (617) 832-1000 | |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * _____
_____BD.1_____ (B) ( ) Yes (X) No

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff is seeking a declaratory judgment concerning a dispute over the purported material breaches and termination of a licensing agreement between Plaintiff and Defendant by which Defendant granted Plaintiff certain rights and licenses in Plaintiff's intellectual property. The improper termination of the licensing agreement threatens Plaintiff's ability to continue to develop and commercialize products created in reliance on the rights provided in the licensing agreement.

RECEIVED AUG 15 2018 SUPERIOR COURT CIVIL MICHAEL JOSEPH DONOVAN CLERK MAGISTRATE

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record _____

DATE: 8/14/18

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

PEAR THERAPEUTICS, INC.,

                Plaintiff,

v.

DROR BEN-ZEEV,

                Defendant.

CIVIL ACTION NO. 1884CV02555 -BLS1

## MOTION FOR APPOINTMENT OF PROCESS SERVER

    Plaintiff Pear Therapeutics, Inc. ("Pear"), moves pursuant to Mass. R. Civ. P. 4(c), for an

order specially appointing Beacon Hill Research, Inc. of Boston, Massachusetts as process server

authorized to serve the summons and complaint and all other process and papers in the above-

captioned case. As grounds for this motion, plaintiff states that all process servers employed by

Beacon Hill Research, Inc. are qualified persons over the age of 18, knowledgeable in the service

of process, and not parties to this action.

Respectfully Submitted,

PEAR THERAPEUTICS, INC.

By its attorneys,

Michael P. Boudett, BBO #558757
Richard G. Baldwin, BBO #670984
Christopher J. Cifrino, BBO #691512
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1000
Fax: 617-832-7000
mboudett@foleyhoag.com
rbaldwin@foleyhoag.com

Dated: August 20, 2018

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court**

4.

CIVIL DOCKET#: **SUCV2018-02555-BLS1**

Case: Pear Therapeutics, Inc. v. Ben-Zeev

## NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials "**BLS1**" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to http://www.mass.gov/courts/court-info/trial-court/sc/sc-bls-gen.html for description of the Project). Counsel may indicate their respective client's participation by completing, filing and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: _8/20/18_

Notice sent
08.21.18
MPB
RGB
FHLP
(MD)

Janet L. Sanders
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

# Commonwealth of Massachusetts
## County of Suffolk
## The Superior Court

CIVIL DOCKET#: _____

Case: _____

      As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: http://www.mass.gov/courts/court-info/trial-court/sc/sc-bls-gen.html)

      If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

[ ]    **Yes,** _____ is willing to participate in the Discovery Project.
              (Party's Name)

Case Name _____

Docket Number CIVIL DOCKET#: _____

Counsel For_____      Date_____

Firm Name and Address:

_____

_____

_____

Please complete this form and return it to:

| | | |
|---|---|---|
| Helen Foley, Asst. Clerk | **OR** | Richard V. Muscato, Jr., Asst. Clerk |
| BLS1, Room 1309 | | BLS2, Room 1017 |
| 3 Pemberton Square | | 3 Pemberton Square |
| Boston, MA 02108 | | Boston, MA 02108 |

# Commonwealth of Massachusetts

SUFFOLK, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. SUCV2018-02555-BLS1

Pear Therapeutics, Inc. , PLAINTIFF(S),

v.

Dror Ben-Zeev , DEFENDANT(S)

## SUMMONS

THIS SUMMONS IS DIRECTED TO Dror Ben-Zeev (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Suffolk Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court <u>and</u> mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a. Filing your signed original response with the Clerk's Office for Civil Business, Superior Court, 3 Pemberton Sq. (address), by mail or in person, **AND** Boston, MA 02108
   b. Delivering or mailing a copy of your response to the Plaintiff's Attorney/Plaintiff at the following address: Foley Hoag LLP, 155 Seaport Blvd., Boston, MA 02210

3. **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as counterclaims) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a "Motion to Dismiss," if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Mass. R. Civ. P. 12. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4. Legal Assistance. You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. Required Information on all filings: The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____, 20____.

*Michael Joseph Donovan*
Michael Joseph Donovan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____, 20____, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

_____

_____

_____

Dated: _____, 20____    Signature: _____

N.B.    TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX — BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.